IN THE CIRCUIT COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

# CASE NO.: 25-11024

_____

UNITED STATES OF AMERICA,

Plaintiff/Appellee

v.

JAMES SABATINO,

Defendant/Appellant

_____

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

INITIAL BRIEF OF APPELLANT

_____

ISRAEL J. ENCINOSA, ESQ.
F.B.N 435007
92300 Overseas Highway, Ste. 302
Tavernier, FL 33070
Tel. (305) 804-6976
Email: encinosalaw@reagan.com

COUNSEL FOR APPELLANT

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

## <u>APPELLANT'S NOTICE CONCERNING CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 11th Cir. R. 26.1-2(c), the Appellant hereby advises that the Certificate of Interested Persons and Corporate Disclosure Statement required by Rule 26.1-2(a) has now been filed and the following is a complete list of all persons and entities that the Appellant believes to have an interest in the outcome of the case, as required by 11th Cir. R. 26.1-1:

Acevedo, Kimberly

Adeler Jewelers

Akris (SRMCL.BO)

Alexander Wang

Audemars Piguet

Bharathi, Sowmya

Bono, Michael A.

Browne, Christopher Barrett

Carter, Shawn, a/k/a Jay-Z

Cartier USA, Inc. (ECRFF)

Caruso, Michael

Charest-Turken, Gabrielle Raemy

Croke, Danielle Nicole

C-1 of 5

Crown Pawn, LLC

Dalzell, Kathryn

Davis, Michael S.

Dion, Scott

DiRosa, Phillip

Duquen, Jorge

East Coast Jewelry

Elan Diamond Group, LLC

Elliott, Jessica Elise

Encinosa, Israel Jose

Entin, Michael James

Fajardo Orshan, Ariana

Ferragamo USA (SFER.IT)

Ferrer, Aimee Allegra

Ferrer, Wifredo A.

Forevermark (Forevermark USA, Inc.)

Four Seasons Hotel (FS)

Garber, Hon. Barry L.

George, Charles Mills-Pittman

Ginsberg, Ivy R.

Gonzalez, Juan Antonio

Goodman, Hon. Jonathan

Greenberg, Benjamin G.

Hunt, Valerie Kay

James Ferragamo (SFRGF)

Jimmy Choo (CHOO)

Judith Leiber Couture, Ltd.

Katz, Martin A.

Katz, Randall K.

Knowles-Carter, Beyonce

Lapointe, Markenzy

Lenard, Hon. Joan A.

Lewis, Denise Siksha

Lipsius, Ira S.

Live Nation Entertainment, Inc. (LYV)

Lopez, Jennifer

Lorraine Schwartz Jewelers

Maken, Debbie

Manolo Blahnik

Martin Katz Jewelers

C-3 of 5

Matzkin, Daniel

McAliley, Hon. Chris

Music Express, Inc.

Nautica (NAUT)

Noto, Kenneth

O'Byrne, Hayden P.

O'Sullivan, Hon. John J.

Otazo-Reyes, Hon. Alicia M.

Parkwood Entertainment

Philipp Plein

Ritz Carlton Hotel (owned by Marriott International) (MAR)

Roc Nation

Rocha, Victor Edward

Rosenbaum, Joseph Steven

Sabatino, James Peter

Schlessinger, Stephen

Simonton, Hon. Andrea M.

Smachetti, Emily M.

Sombunthan, Nalina

Sony Music Entertainment (SNE)

C-4 of 5

Spizman, Justin

Stephen Russell Jewelers

Sundaram, Sivashree

Tiffany & Co. (TIF)

Tobian, Ben

Turnoff, Hon. William C.

USP Admax

Van Cleef & Arpels

W Hotel (acquired by Marriott International) (MAR)

Wade, Dennis M.

Wanshel, Laurence A.

Wax, Barry

White, Hon. Patrick A.

Zelentez, Russell

Respectfully submitted,

By: /s/ *Israel J. Encinosa*        ,
Israel Jose Encinosa, Esq.
FBN 435007

C-5 of 5

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant respectfully submits that oral arguments will aid this Court's decision-making process by giving the parties the chance to articulate the arguments made in their briefs, to discuss the applicability of precedents found or decided after the briefs are submitted.

## STATEMENT REGARDING PREFERENCE

This is a criminal case on direct appeal from a final decision of the United States District Court for the Southern District of Florida. This case is entitled to preference pursuant to Federal Rule of Appellate Procedure 45(b) because the Appellant, **James Peter Sabatino,** was convicted and is currently serving a term of imprisonment of **240** months.

## CERTIFICATE OF COMPLIANCE

The Appellant certifies that a 14-points Times Roman font was used in this brief and pursuant to Federal Rule of Appellate Procedure 32 (a) (7) (C) the brief contains 10,995 words.

i

TABLE OF CONTENTS

Page:

Certificate of Interested Persons………..………….………………….   C-1

Statement Regarding Oral Argument…………..…………………….…..   i

Statement Regarding Preference……………….……………………..   i

Certificate of Compliance……………………………….…………….   i

Table of Contents...…………….……………………………………….   ii

Table of Citations…………………………………………………...   iii

Statement of Subject Matter & Appellate Jurisdiction…………...............   vii

Statement of Issues………………………………………….……….   1

Statement of the Case……….………….……………………………..   2

Course of Proceedings and Disposition in Court Below………………...   2

Statement of the Facts…………………………………………………..   19

Standard of Review……………………………………………………..   20

Summary of Arguments……………………………………………….   21

Argument I ......…..…………………………………………………...   26

Argument II………..……………………………………………………..   35

Argument III .……..…………………………………………………...   41

Argument IV……….……………………………………………………   42

Conclusion…………………………………………………………….   45

Certificate of Service…………………………………………………...   46

TABLE OF CITATIONS

Cases                                                                Page

*Affiniti Coloradi, LLC v. Kissinger & Fellman,*

2019 Colo. App. Lexis 1370 (2019)…………………………………… 38, 39

*Bonner v. City of Pritcherd,*

661 F.2d 1206, 1209 11th Cir 1981)………………………………… 27

*Cooter & Gell v. Hartmax Corp.,*

496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)………….. 26

*Cumulus Media, Inc. v. Clear Channel Communications, Inc.,*

304 F.3d 1167, 1178 (11th Cir. 2002)………………………………… 41

*Duplan Corp. v. Moulinage et Retorderie de Chavanoz,*

487 F.2d 480 (4th Cir. 1973)………………………………………… 38, 39

*Harbor Healthcare System., L.P. v. United States,*

5 F.4th 593 (5th Cir. 2021)…………………………………………… 28

*Hudson v. Palmer,*

408 U.S. 517, 526 (1984)……………………………………………. 32, 33

*Hunt v. Blackburn,*

128 U.S. 464, 470 (1888)…………………………………………… 35, 36

*In re Murphy,*

560 F.2d 326 (8th Cir. 1977)………………………………………… 38, 39

iii

*In re Search Warrant Issued June 13, 2019,*

942 F. 3d 159, 167, 172–73 (4th Cir. 2019)……………………………… 35

*Lanza v. New York,*

370 U.S. 139, 143–44 (1962)…………………………………………… 36

*Mesa Valderrama v. United States,*

417 F.3d 1189, 1194 (11th Cir. 2005)…………………………………… 20

*Nordstrom v. Ryan,*

762 F. 3d 903, 910 (9th Cir. 2014)……………………………………… 36

*Richie v. Smith,*

515 F.2d 1243 (5th Cir. 1975)………………………………….. 20, 26, 27

*State of Florida v. Rabin,*

495 So. 2d 257, 262-263 (Fla. 3d D.C.A. 1986)………………………. 39

*Taylor Lohmeyer Law Firm P.L.L.C. v. United States,*

982 F.3rd 409, 411 (5th Cir. 2020)…………………………………….. 38

*Thompson v. Covington,*

43 F.3d 974, 975 (8th Cir. 1995)……………………………………….. 34

*Trump v. United States,*

54 F.4th 689 (11th Cir. 2022) ………………………………………….. 27

*United States v. Allmon,*

702 F.3d 1034 (8th Cir. 2013)………………………………………….. 43

iv

*United States v. Bryant,*

685 F.App'x 855, 856 (11th Cir. 2017)………………………………… 28

*United States v. Caraballo-Martinez,*

866 F.3d 1233, 1238 (11th Cir. 2017)………………………………… 20

*United States v. Chapman,*

559 F.2d. 402, 406 (5th Cir. 1977)………………………………… 27

*United States v. De La Mata,*

535 F.3d 1267, 1279 (11th Cir. 2008)………………………………… 20

*United States v. Felipe,*

148 F.3d 101 (2nd Cir. 1998)………………………………… 5, 6, 43

*United States v. Giovanelli,*

998 F.2d 116 (2nd Cir. 1993)………………………………… 34

*United States v. Howell,*

425 F.3rd 971, 974 (11th Cir. 2005)………………………………… 33

*United States v. Laist,*

702 F.3rd 608 (11th Cir. 2012)………………………………… 30

*United States v. Leggett Platt, Inc.,*

542 F.2d 655 (6th Cir. 1976)………………………………… 38, 39

*United States v. Levasseur,*

609 F. Supp. 849 (D. Me. 1985)………………………………… 34

*United States v. Mitchell*,

565 F.3rd 1347, 1350 (11th Cir. 2009)……………………………….. 30

*United States v. Moore*,

541 F.3d 1323, 1326 (11th Cir. 2008)………………………………… 20

*United Sates v. Potes Ramirez*,

260 F.3d 1310 (11th Cir. 2001)……………………………………….. 44

*United States v. Prevo*,

435 F.3rd 1343, 1346 (11th Cir. 2006)……………………………….. 30, 31

*United States v. Scott*,

2003 U.S. Dist. LEXIS 28031 (M.D. Ala. 2003)……………………… 44

*Upjohn Co. v. United States*,

449 U.S. 383, 389 (1981)…………………………………………… 35, 36

*U.S. Carter v. United States,*

62 Fed. Cl. 365 (Fed. Cl. 09/29/2004)…………………………………. 35

**<u>Constitution, Statutes and Other Authorities</u>**

Due Process Clausee, United States Constitution…………………1, 21, 41, 42, 44

Fourth Amendment, United States Constitution……………………1, 13, 15, 26, 32

Fifth Amendment, United States Constitution ………………….....1, 13, 15, 26

Sixth Amendment , United States Constitution……………………...1, 13, 15, 26

18 U.S.C. § 1349…………………………………………………….. 2

18 U.S.C. § 1962(d)…………………………………………………. 2

18 U.S.C. § 3231…………………………………………………….. vii

18 U.S.C. § 3582(d)…………………………………………………. 5, 6, 7

18 U.S.C. § 3582(e)………………………………………1, 4, 5, 19, 24, 29, 42, 43

28 U.S.C. § 1291…………………………………………………….. vii

28 USC § 1404(a)…………………………………………………… 44

Federal Rule of Appellate Procedure 32 (a) (7) (C)……………………. i

Federal Rule of Appellate Procedure 45(b)…………………………….. i

Federal Rule of Criminal Procedure 41…………………………………. 34

Federal Rule of Criminal Procedure 41(g)……………………20, 23, 28, 34, 44

11th Cir. R. 26.1-1……………………………………………………. C 1 of 5

11th Cir. R. 26.1-2(a)…………………………………………………. C 1of 5

11th Cir. R. 26.1-2(c)…………………………………………………. C 1 of 5

Local Rule (SDFL) 7.1(b)(1)…………………………………………… 15

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The District Court has jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States. This Court has jurisdiction over this criminal appeal by virtue of 28 U.S.C. § 1291, which provides that the Courts of Appeals have jurisdiction to hear appeals

from all final decisions of the United States District Courts. The Appellant pled guilty and was sentenced to a prison term of <u>240 </u>months on <u>November 20, 2017.</u> [DE:287]

## STATEMENT OF THE ISSUES

### I

**The District Court errored in finding it did not have jurisdiction to order the return of property and said denial violated the Appellant's Fourth, Fifth, and Sixth Amendment Rights of the United States Constitution.**

### II

**The District Court has jurisdiction over the violation of attorney client privilege by the Government in a case that is before the same Court.**

### III

**The District Court errored by denying the Appellant an evidentiary hearing.**

### IV

**The District Court violated the Appellant's Due Process Rights by holding that the proper venue is in the District of Colorado despite previously having imposed severe communication restrictions upon the Appellant pursuant to 18 U.S.C. 3582(e), which prohibit the Appellant from communicating with the District Court of Colorado.**

1

## STATEMENT OF THE CASE

James Sabatino was the Defendant in the District Court and will be referred to by name or as the Appellant or Defendant where appropriate. The Appellee, the United States of America, will be referred to as the Government. The record will be noted by reference to the volume number, document number, and page number of the record on appeal as prescribed by the rules of this Court. The questions presented in this case are issues of first impression as this is the first time in the history of our nation a District Court Judge has restricted a Defendant's communication to just one social contact as part of his sentence.

The Appellant is presently incarcerated at ADX Florence and is serving 240 months term of imprisonment with special condition of confinement pursuant to 18 U.S.C. § 3582(e) and is consecutive to several other federal sentences.

## COURSE OF PROCEEDINGS AND DISPOSITION BELOW

On June 30, 2016 a grand jury in Miami, Florida returned a fourteen count Indictment against Appellant and others charging them with conspiracy to violate the Racketeer Influence and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d); Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349; and numerous counts of Mail Fraud. [DE:3] Thereafter, a Superseding Information was filed charging Sabatino with 29 offenses including those listed above. [DE:214]

According to the Stipulated Factual Proffer, the charges arose from Mr.

2

Sabatino, known to law enforcement as a member of the Gambino Organized Crime Family of La Cosa Nostra ("LCN") and being the sole organizer and leader of a prison-based enterprise that is associated with the Gambino Family of LCN. The enterprise engaged in acts of Mail and Wire Fraud, Interstate Trafficking of Stolen Property, Obstruction of Justice, Introduction of Contraband into Federal Prisons, Witness Intimidation, Bribery, Conspiracy to Commit Murder and other criminal activities in the Southern District of Florida, Southern District of New York and the Northern District of Georgia. [DE:231:2-2]; [DE:286:5-6]

While incarcerated Sabatino obtained a series of cellular telephones, which he acquired from federal correctional officers. Through the use of these telephones, visits and other inmates, Sabatino and other members of the enterprise conducted regular meetings by telephone, in person or by other means of communication, during which they planned, and otherwise engaged and discussed, criminal activities, including Fraud, Interstate Trafficking of Stolen Property, Introduction of Contraband into Federal Prisons, Bribery, Obstruction of Justice, Witness Intimidation and Murder. [DE:231:5-6]

During the course of the racketeering conspiracy, Sabatino repeatedly communicated with members and associates of the Gambino Organized Crime Family of LCN and directed them to threaten violence and murder those who posed a threat to him or the enterprise or jeopardized its operations, including witnesses to the illegal activities of the enterprise. [DE:231:3, 6-7, 10-11]

3

From his prison cell, Sabatino recruited a number of other individuals, including other inmates, federal corrections officers and non-incarcerated co-conspirators to participate and carry out those activities.[ DE:231:3-11] Despite the fact that Sabatino was incarcerated, members and associates of the enterprise were willing to follow his orders and directives. As a result, Mr. Sabatino was able to orchestrate the theft of over $10,000,000.00 worth of jewelry during a two-month period. [DE:231:3-11]

In the Plea Agreement and Stipulated Letter of Understanding, which were executed on the same day as his plea hearing, Sabatino agreed to plead guilty to Count 1, of the Superseding Information, to the RICO conspiracy. [DE:230:1] [232:1] Sabatino also agreed to the Government filing a Motion pursuant to 18 U.S.C. § 3582(e) for Special Conditions of Confinement, to wit:

3(a). The Defendant be prevented from communicating with anyone other than his step-mother, Carol Fardette, undersigned counsel, Joseph S. Rosenbaum, and paralegal Kimberly Acevedo during the term of his imprisonment.

3(b). The Defendant be prevented from communicating with other inmates during the term of his imprisonment; and

3(c). These conditions continue until such time as the Defendant unequivocally demonstrate he will not threaten or do violence and/or physical harm to other persons. [DE:232:1]

Sabatino agreed to these terms to ensure at minimum the Government would not attempt to prevent him from communicating with his step mother, Carol Fardette, Attorney Joseph S. Rosenbaum, and paralegal (Now attorney) Kimberly

4

Acevedo. Mr. Sabatino understood and acknowledged that due to his current charges, as well as his extensive history of continuing criminal activity from prison, that the Government would seek communication restrictions.The purpose of the plea was for the Government to acknowledge that Sabatino would be able to communicate with the above named persons.

At his sentencing hearing, the District Court sentenced Sabatino to 240-months in prison, to run consecutively to the sentences imposed in other federal and State cases. [DE:287:2] The District Court orally Granted the Government's Agreed Motion Requesting Imposition of Communication Restrictions pursuant to 18 U.S.C. § 3582(d). [DE:269] The District Court entered said Order in which it made specific findings of facts based upon Sabatino's guilty plea to conspiracy to violate the RICO act, the Stipulated Factual Proffer and his extensive criminal history, wherein many of his crimes were committed while in federal custody. [DE:286] While 18 U.S.C. § 3582(e) only authorizes communication restrictions with a "specific person", because Sabatino is a leader of a large national criminal organization, and in accordance with the with the holding of *United States v. Felipe*, 148 F.3d 101, 109 (2nd Cir. 1998) the Court held:

> We do not believe Congress expected sentencing courts to list every individual of a racketeering organization in cases where sufficient reasons exists to believe that association with **any** member is for purpose of participating in an illegal enterprise. Racketeering groups are often large and boast a constantly changing membership. It would be difficult, if not virtually impossible, to identify each and every active member of such

5

an organization. The purpose of 3582(d) "is to prevent the defendant from continuing his illegal activities from his place of confinement." [Emphasis in original] [DE:286:8 citing *Felipe* at 110]

Thus, the Court found specifically "that there is probable cause to believe the Defendant's association or communication with persons other than his stepmother, his attorneys, or the attorney's staff would enable Defendant to "control, manage, direct, finance , or otherwise participate in an illegal enterprise'." [DE:286:5] Again, with the understanding that he could submit names of specific persons with whom no probable cause existed, Sabatino did not object to the imposition  of the restrictions. The Court then imposed the following restrictions on Sabatino's communication as part of his sentence pursuant to 18 U.S.C. § 3582(d) in pertinent part:

> b. Defendant should be limited, within the U.S. Marshals Service, (BOP), detention facility's reasonable efforts and existing confinement conditions, from having contact, (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, that could reasonably foreseeably result in the Defendant communicating (sending or receiving) information that could allow the Defendant to circumvent  the court's intent of significantly limiting Defendant's ability to control, manage, direct, finance or otherwise participate in an illegal enterprise;
>
> c.The restrictions specified above should permit Defendant's contacts and communications with the following persons:
>
> i.    Carol Fardette, Defendant's stepmother;
> ii.   Joseph S. Rosenbaum, Esq., Counsel for the Defendant; &
> iii.  Kimberly Acevedo, Esq., Co-counsel for Defendant.

6

d. The restrictions specified above shall remain in place until the Defendant demonstrates his communication no longer pose a threat.

3. **The Court retains jurisdiction to consider any <u>applications made by the Defendant</u>, <u>Defendant's attorneys, or the Government to modify these special conditions of confinement.</u>** [Emphasis added] [DE:286]

These same restrictions were incorporated into Sabatino's Judgment and Sentence as Special Conditions of Confinement pursuant to 18 U.S.C. § 3582(d). [DE:287]

On December 21, 2017, the District Court directed Mr. Rosenbaum "to continue further representation of the Defendant" and required that "All motions or requests shall be filed by counsel for the Defendant." [DE:314]

On April 20, 2018 Appellant was transported to the Federal Supermax ADX Florence. Upon arrival, Sabatino learned that the wording of his communication restrictions in the Plea Agreement and Court's Order had been changed and thus greatly diminishing the enforcement of his restrictions. On October 18, 2018, Sabatino filed an Unopposed Motion to Modify the Communication Restrictions Order. [DE:497] & [DE:506] In his Motion, Sabatino simply requested that the restrictions reflect the language of the Plea Agreement and the Stipulated Letter of Understanding. The Government agreed with Sabatino's request.

On November 2, 2018, the District Court Granted Sabatino's request to Modify the Previously Imposed Communication Restrictions. [DE:508] The Court

7

modified the communication restrictions to include the following conditions of confinement:

> "Defendant shall be confined during the time of his incarceration so that he has no contact with other prisoners; and
>
> Defendant's communication shall be restricted from all persons inside and outside of prison, except for: Carol Fardette, Joseph S. Rosenbaum, Kimberly Acevedo and Ivy Ginsburg." [DE:508:2]

The Appellant is serving his sentence at the Federal Supermax ADX Florence in Colorado. He is in a special wing of the Special Administrative Measures ("SAM") Unit called "The Suites." There are only four cells in the wing; each 12' x 7' cell is equipped with a bed, desk, bathroom, shower, and a separate recreation cage. Sabatino's cell has a camera equipped with night vision and sound, this subjects Sabatino to 24/7 audio and visual surveillance, which is monitored and recorded by both the BOP and the FBI. The only other inmate on the range is alleged Drug Kingpin Joaquin "El Chapo" Guzman. Sabatino is prohibited any contact, association or communication with anyone else in the unit.[1] He has extremely limited contact with correctional staff. Sabatino is only allowed 2 social phone calls per month (for 15 minutes) and while he can write letters, as noted his only approved social contact is his step-mother.

---

[1] Although Sabatino's communication restrictions prohibit any communication or association with other inmates, Guzman has virtually the same restrictions with the exception that he has several more approved outside social contacts than Sabatino.

8

Beginning in early January, 2025, at the request of defense counsel, the appellant began to access his two discovery hard drives to help assist counsel in the preparation of anticipated motions in three pending State cases. The discovery hard drives are located in a locked room in the Special Security Unit (SSU), commonly referred to as the "discovery room". Only ADX staff have access to that room. The computer is behind a Plexiglass wall. When an inmate requests to view the the material in his hard drive or other media, he is put in restraints and is escorted to the other side of the Plexiglass wall and secured in that side of the room. An officer will load the media in the computer on the other side and then the inmate can begin to review the material.

On January 17, 2025, the Appellant went to the discovery room to view the material on his hard drives. Specifically, the Appellant was searching for exculpatory evidence regarding his open and pending State cases. On that day the Appellant was reviewing pictures from a forensic download of his social media accounts provided by the Government in its 2016, Standing Discovery Response. Direct exculpatory evidence for his State cases are located within this file. The session was uneventful and after he was done for the day, the Appellant was escorted back to his cell.

The next day the Appellant attempted to go back to the discovery room, only to be told that the computer was "broken". This continued everyday for over a week.

Finally, after repeated complaints about being denied access to his hard drives, staff admitted that this was a lie.

On February 2, 2025, the Appellant was told by ADX Attorney Adam Powell that on January 17, 2025, an ADX officer notified him that he observed the Appellant viewing what appeared to be an inappropriate image on the discovery computer. Based on this, Mr. Powell reached out to the Assistant United States Attorney (AUSA) in the Appellant's criminal case, Christopher B. Browne, to find out if Sabatino was allowed to be in possession of this material. Mr. Powell stated that AUSA Browne advised him that the hard drives were under a "protective order" issued by the District Court and that the Appellant was not supposed to be in possession of them. Thus, ADX Attorney Powell stated that the Appellant would be denied access to the hard drives until he received further instructions from AUSA Browne. The Appellant replied to Mr. Powell that what AUSA Browne told him was not true and that there were no protective orders in this case. Mr. Powell stated he was following the directives of AUSA Browne and would await his guidance.

Counsel for Appellant immediately sent an email dated to February 3, 2025, to Mr. Powell, protesting the denial of Sabatino's access to his hard drives, to make Mr. Powell aware that there was no protective order in this case and that the Appellant needed to view the material on his hard drives, in order to prepare for his pending criminal State cases. [DE:702:14] The email was not responded to.

On February 11, 2025, counsel for the Appellant sent an email to AUSA Browne, protesting his directives to prohibit Sabatino from accessing his hard drives and his false claims to ADX Attorney Adam Powell that the hard drives were under a "protective order". The email went on to explain that the Appellant was reviewing the material on the hard drives in preparation for defense motions in his pending State cases. Counsel demanded that AUSA Browne inform Mr. Powell that there were no protective orders and to allow the Appellant to continue to access his hard drives. [DE:702:19]

On February 14, 2025, AUSA Browne replied claiming for the first time that Sabatino was "caught" looking at pornography under the guise of reviewing discovery. AUSA Browne denied that he directed Mr. Powell to prohibit the Appellant access to the hard drives, but did not address the accusation that he falsely informed Mr. Powell that the hard drives were under a "protective order" from the District Court. [DE:702:16] On February 18, 2025, counsel for the Appellant replied to AUSA Browne explaining that the Appellant was not "viewing pornography". Rather an officer viewed what he thought "might" be an inappropriate image and was not sure if the inmate was supposed to be in possession of it. Counsel went on to represent to AUSA Browne that despite his doubts, the discovery hard drives did in fact contain direct exculpatory evidence regarding the Appellant's State cases. Finally, as for AUSA Browne's claim that he did not direct Mr. Powell to deny the Appellant access to the hard drives, it was

11

requested he clarify this because as of that date Mr. Powell was still insisting that Sabatino was being denied access to his hard drives at the request of the United States Attorney's Office. [DE:702:17]

On that same day, counsel for the Appellant forwarded AUSA Browne's email to ADX Attorney Powell. It was requested that: 1) He acknowledge that the Appellant was not "caught" viewing pronography; 2) He acknowledge that AUSA Browne directed him to seize the hard drives on his behalf; 3) He acknowledge that none of Sabatino's discovery is under a protective order; and 4) If necessary, Sabatino was willing to send the hard drives back to his counsel. [DE:702:20] This email was not responded to.

On March 4, 2025, counsel for the Appellant received an email from AUSA Browne that was also directed to ADX Attorney Powell. The first part of the email was addressed to Mr. Powell announcing that "there is no reason" for Sabatino to be viewing discovery and then directed Mr. Powell to turn the "seized items" over to the FBI. The second part of this email was addressed to Appellant's counsel demanding that Appellant's counsel fill out a "privilege log" listing all of the attorney client privileged material on the hard drives. AUSA Browne then stated if counsel did not complete the log, he would be "waiving privilege". [DE:702:13]

For the first time, Appellant's counsel became aware that the Government was now seizing the hard drives and was attempting to access them. Then counsel immediately responded to AUSA Browne that he was not trial counsel and needed

12

to confer with four of the Appellant's other trial attorneys, as well as with Mr. Sabatino to ascertain the amount of the attorney client privileged material on the hard drives. Counsel made clear that he was not waiving any privilege and objected to the Government's illegal seizure of the Appellant's hard drives.

Then counsel also immediately requested a legal telephone call with Sabatino, which was not able to occur until March 11, 2025. Upon conferring with the Appellant and Sabatino's trial attorneys, counsel for the Appellant learned the full extent of the attorney client privileged material contained in the hard drives that the Government was now taking custody of and seeking to review.

Being fully aware of the emergent nature of these circumstances, on March 11, 2025, after the first chance counsel was able to communicate with the Appellant, an Amended Emergency Motion for Order to Return Property and for an Evidentiary Hearing was filed. [DE:702] Counsel set forth in the Motion a "Basis for Emergency". Specifically, that without any warning or seizure order, the Government has seized two of the Appellant's hard drives and is intending on turning them over to the FBI to access, despite of being warned by counsel that the hard drives contain attorney client privileged material. The Motion stated "An emergency hearing is required to prevent further violation of the Defendant's Fourth (4th), Fifth (5th), and Sixth (6th) Amendment Rights of the United States Constitution." [DE:702:1-2]

13

The Motion goes on to explain that the hard drives contain hundreds of thousands of pages of attorney client privileged documents. (Id.3) It also explains that the Appellant was viewing direct exculpatory evidence for a pending felony State charge. Counsel explained that while we could not publicly disclose the exculpatory evidence due to the pending charges, he was willing to provide the District Court a detailed explanation *ex-parte* and under seal. (Id.5)

Relevant to the District Court's jurisdiction in the Southern District of Florida (SDFL), the Motion explains that the hard drives were originally seized by the AUSA in this Case, under the guise that the Appellant's possession of the hard drives violated a "protection order" issued by that very Court. (Id.6) The Appellant's Motion requested that the Court hold an evidentiary hearing to determine that the hard drives were seized at the direction of the prosecutor in this case. (Id.4) On March 14, 2025, the District Court issued an Order directing the Clerk to remove the "emergency designation" of the Appellant's Motion, because he did not include a "Certification of Emergency". [DE:704] While counsel did fail to include a "Certification of Emergency," he did include a "Basis for Emergency". On March 18, 2025, after speaking with the Appellant, counsel filed an Emergency Motion for an Injunction to Prohibit the Government from Seizing and Accessing the Defendant's Hard Drives, which contain attorney client privileged and work-product information until the Court rules on the Defendant's Amended Emergency Motion to Return Property and Hold an Evidentiary Hearing. [DE:705]

14

The Motion, pursuant to Local Rule 7.1(b)(1), stated this Emergency Injunction was needed to "prevent a significant violation of the Defendant's 4th, 5th, and 6th Amendment Rights under the United States Constitution". (Id.1) This Motion went into great detail of the extent of attorney client privileged material on the hard drives and as to how the Appellant would be irreparably harmed if the Government was allowed to access the hard drives. The Motion contained a "Certificate of Emergency". (Id.1)

Rather than recognizing the emergency request for an injunction pending a ruling, on the same day the District Court issued an Order describing the Appellant's Motion as having "supplemented" his previous motion, with a Certification of Emergency. [DE:706] The Court Ordered the Government to respond no later in March 20, 2025, at 2 P.M., and the Appellant's reply no later than March 21, 2025, at 9 A.M. (Id.)

The Government filed its response on March 20, 2025. [DE:710] The Government's response was centered on the argument that the District Court did not have jurisdiction because it was "prison authorities in Colorado" who seized the hard drives. (Id. 1-4) The response goes on to claim that the seizure was entirely a Bureau of Prisons (BOP) operation, and that they did not "direct", the seizure of the hard drives. (Id.5)

In an absurd argument, the Government's response dismissed the claim of attorney client privilege, and the fact that Mr. Sabatino has open and pending

15

criminal cases in which the material on the hard drives is not just relevant, but also exculpatory. The Government describes one of the Appellant's open cases as just a "California case involving an unpaid $2,159.00 hotel bill." (Id.8) The Government seemingly suggested that these felony charges were somehow unworthy of attorney client privilege.

Then for the first time, the Government response claims in a footnote that the hard drives were turned over to the FBI agents in the SDFL, responsible for monitoring the Appellant's compliance with his Special Administrative Measures (communication restrictions). (Id. at 8 footnote 7)  The Government goes on to claim that the FBI "…have begun, with concurrence from the United States Attorneys Office, an investigation into how Sabatino was able to obtain these materials inside a maximum security facility." (Id.)

Strangely, the Government's response states that even if there was attorney client work product material on the hard drives, the Appellant  "… does not say why authorities can not review [it]." (Id. at 9)

On March 21, 2025, the Appellant filed his reply, again maintaining that the seizure of the hard drives was solely at the direction of the Government in this case. [DE:711] The reply argues that the Government's claim that the seizure was a BOP operation is contradicted by the fact that 1) To this date, the BOP has not given the Appellant any confiscation notice or disciplinary charges; 2) The email exchanges between the Government and the ADX attorney prove the directives for

16

the seizure came from AUSA Browne; 3) ADX staff made statements to the Appellant regarding why the seizure was happening; and, 4) the fact that the hard drives are now in the SDFL in the hands of the FBI agents overseeing this case. (Id. at 2-4)

The reply argues that the Government's response that the hard drives were seized by the BOP because the Appellant was caught "viewing pornography" is simply not true. (Id. at 6) The reply makes clear that the Appellant was never "viewing pornography" as the Government insists. Appellant did not receive any disciplinary charges regarding this. The officer who wrote the original memo, was not sure what he saw. In any event, the Appellant argued that even if there was pornography on the hard drives, the proper remedy would be for him to receive a BOP confiscation notice, for which the Appellant would be given an opportunity to contest the confiscation of his property by the BOP. Even if unsuccessful, the Appellant would be given the choice to send the material to a person on the outside or have it destroyed. (Id. at 5-6) The reply goes on to state that in this case, none of that happened and that the hard drives were actually turned over to the criminal prosecution team in the SDFL. (Id.)

The Reply explains that the hard drives contained hundreds of thousands of pages of material, thousands of which are attorney client privileged. (Id. at 7) The Reply submitted the Government's contention that the Defendant has no need to review the discovery in this case because this case is "closed" is contradicted by

17

the fact that in the years following the final conviction of the Appellant in this matter, the Government has periodically filed litigation that requires the Appellant to review his discovery. (Id. at 7-8)

The Appellant's Reply requested the Court order the Government to turn over the hard drives to counsel or to hold an evidentiary hearing to establish the disputed facts in this case, especially as it relates to who directed the seizure for jurisdictional purposes, to establish the extent of the attorney client privileged material on the hard drives and how the Appellant would be irreparably harmed if said privilege was violated.

On March 25, 2025, the District Court issued an Order denying the Emergency Motion for Order to Return Property and for an Evidentiary Hearing. [DE:712] The Court did not address any of the Appellant's arguments on its merits and instead Denied the Motion as to a jurisdiction issue only. The Court's Order erroneously claimed that the Appellant alleged that his two hard drives, "were illegally seized by the [BOP]…". (Id.)

The Court's Order ignored the Defendant's argument that the hard drives were seized at the direction of the AUSA in this Case, under the false pretense of a "protective order" issued by the District Court for the SDFL; that the property seized contain attorney client privileged material from Defendant's previous defense attorneys in this case; and, that the seized property was now in the SDFL in the hands of the prosecution team in this case. Instead, the District Court found

18

that the correct forum for the Motion is with the District Court of Colorado. (Id. at 3) Interestingly, the Court's Order is silent on the serious allegations of the violations of attorney client privilege, the request for an injunction and the fact that that while the Court found the proper venue was in District of Colorado, it did not explain how the Appellant would access said court, as he is specifically prohibited from doing so by the Court Ordered to communicate restrictions, pursuing to 18 U.S.C. § 3582(e).

The Appellant filed his Notice of Appeal on March 27, 2025. [DE:750]

## <u>STATEMENT OF FACTS</u>

The Course of Proceedings and Disposition Below adequately sets forth the facts for purpose of this appeal.

## STATEMENT OF STANDARD OF REVIEW

The Court of Appeals reviews *de novo* questions of statutory interpretation. *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1238 (11th Cir. 2017); *United States v. Moore*, 541 F.3d 1323, 1326 (11th Cir. 2008).

The Court of Appeals reviews a District Court's denial of a motion for return of seized property under Rule 41(g) for abuse of discretion. *United States v. De La Mata,* 535 F.3d 1267, 1279 (11th Cir. 2008).

A District Court's subject matter jurisdiction is a question of law the Eleventh Circuit reviews *de novo. Mesa Valderrama v. United States,* 417 F.3d 1189, 1194 (11th Cir. 2005).

The Court of Appeals reviews a District Court's decision to not exercise equitable jurisdiction for abuse of descretion. *Richie v. Smith*, 515 F.2d 1243 (5th Cir. 1975)

## SUMMARY OF THE ARGUMENT

Upon information and belief, Mr. Sabatino is the most restricted prisoner in the United States, prohibited from associating or communicating with anyone inside or outside of prison, except for one of his attorneys and a single family member. In this case, Sabatino was charged and convicted of being the leader of a national criminal organization and ordering numerous crimes, including murder from his prison cell. Based on this and his history of ordering criminal activities from prison for a number of years, the Appellant understands the severe communication restrictions and heightened monitoring of his communications by the FBI.

However, while the Appellant's Constitutional Rights are somewhat limited, he still has a Right to Due Process and attorney client privilege. The evidence is clear that the Appellant's hard drives were seized at the direction of the AUSA in this case. The notion that the hard drives were seized by the BOP due to an allegation that the Appellant was viewing pornography, is not supported by the facts. To date, the Appellant has never been charged or accused by the BOP of possessing any contraband. The Government has repeatedly mischaracterized the very brief and vague memorandum that the ADX officer wrote. In any case, the memo was an internal one and the officer has stated multiple times that he was ordered to write it and was not sure exactly what he had actually seen.

21

The truth is that no matter how many times the Government says it, the Appellant was not "caught" viewing pornography and the BOP did not seize the hard drives on its own volition. The BOP never actually seize the hard drives *per se,* rather it denied the Appellant access to them at the request of the AUSA in this case. To the extent that the hard drives were seized in Florence, Colorado, it was at the direction and authorization of the AUSA and BOP staff mailed the hard drives to the Government's trial team in the SDFL.

The District Court not only had jurisdiction over this issue, it is the only court that could possibly decide this. First, the AUSA in this case stopped the Defendant's access to the hard drives by deliberately misinforming ADX/BOP staff that the hard drives in question were under a "protective order" issued by the District Court. This is an important fact, the possibility of there being an inappropriate image on the hard drives is not why the hard drives were seized, rather it is why the ADX attorney reached out to the AUSA. It was at this point that the AUSA told the BOP that the hard drives were under a protective order and the Appellant was prohibited from having them.

If the District Court does not have jurisdiction over property seized in its own name, then no court should. The Government represented to the BOP that the District Court had issued an order that prohibited the Appellant from having access to the hard drives. Thus, the District Court should have jurisdiction over actions done in its name by a prosecutor in a case in that same court.

22

Then there is the fact that the property seized contains attorney client privileged material from the same District Court Case. Surely the District Court should have jurisdiction of violations of attorney client privilege by participants in a case before it, regardless of where the violation occurs.

The Government's actions in this seizure were outrageous. Without any probable cause, or warrant, it seized thousands, if not tens of thousands of pages of attorney client privileged communications and work product, much of it from attorneys in this case. Shockingly, the Government did not deny this but rather declared that the Appellant has not explained why the Government should not be able to view the privileged information, because they claim the case was "closed". Again, the District Court in this case was in the best position to rule on the survivability of the attorney client privilege between the Appellant and his legal team.

The District Court should also have jurisdiction over seized property that is currently in the possession of the prosecution team, in this case, in the SDFL. The hard drives are literally and physically located in the jurisdiction of the District Court, in the possession of the prosecution team in this case.

Federal Rules of Criminal Procedure 41(g), nor the Eleventh Circuit in any prior case anticipated the unique circumstances of the seizure in this case. The Appellant's argument is that every action of this seizure was directed and controlled by the prosecutor in this case, in the SDFL.

23

It should also be considered that the District Court's denial of jurisdiction left the Appellant without any vehicle to challenge the illegal seizure. The District Court's Order that the proper venue was in the District of Colorado, ignores the fact that the Appellant does not have access to file any pleadings in that court due to communication restrictions imposed by the District Court in this case, pursuant to 18 U.S.C. § 3582(e). The District Court is well aware that Appellant is prohibited from communication with the District Court of Colorado or any other court for that matter. To cure any Constitutional violation, the Court directed attorney, Israel Jose Encinosa, to file any pleadings or communications with the Court on Sabatino's behalf. Thus, by Order of the Court, counsel is the Appellant's sole access to the court's. The problem in this matter is that counsel for the Appellant is not admitted to practice in the District of Colorado. The Court's Order was silent on how it expected the Appellant to file an action in the District of Colorado.

Finally, the District Court errored in denying the Appellant an evidentiary hearing. An evidentiary hearing in this case is essential to deciding jurisdiction. The District Court seemingly accepted that the hard drives were seized by the BOP in Florence, Colorado. The District Court ignored the Appellant's contention that this was not true. An evidentiary hearing could have shown that:

1) The Appellant was never "viewing pornography", and that he never received any incident report or accusations regarding this;

24

2)   It could have been established that if the BOP was the entity that seized the hard drives, the Appellant would have been given a confiscation form, an opportunity to challenge the confiscation, and if that was unsuccessful, an opportunity to send the property to a person of his choosing on the outside;

3)   That the officer who wrote the original memo is adamant that he was never sure what it was that he'd seen on the screen of the computer. He was sure that he did not see nudity. That he was uncomfortable writing the memo in the first place, but was ordered to do so.  The officer could also establish through testimony that he was ordered to lie to the Appellant concerning why he couldn't access the hard drives by telling him the computer was "broken". Lastly, the officer could testify that his second memo contained numerous inaccuracies, and he suspected it had been doctored;

4)   It could have been established that the seizure of the hard drives were directed at every step by the AUSA in this case, that the Government provided a false justification to the BOP for the seizure, claiming the Appellant was violating a "protective order" that the hard drives were allegedly under and that the AUSA "authorized" the BOP turn over the hard drives to the FBI in this case;

5)   Thousands, if not tens of thousands, of attorney client privileged documents from this case, including exculpatory evidence in three open and pending criminal cases are in the hard drives; and

25

6)  That this seized hard drives are currently in possession of the FBI in the

SDFL.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I

**The District Court errored in finding it did not have jurisdiction to order the return of property and said denial violated the Appellant's Fourth, Fifth, and Sixth Amendment Rights of the United States Constitution.**

This Circuit reviews a District Court's decision to not exercise equitable jurisdiction for abuse of discretion. *Richie v. Smith*, 515 F.2d 1243 (5th Cir. 1975) "a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law, or on a clearly erroneous assessment of evidence." *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

The Appellant submits that the District Court clearly errored in finding that the case law and statute prevented it from exercising jurisdiction over this Motion to return property. [DE:712] The District Court took the position that it did not have discretion to exercise jurisdiction, which was clearly erroneous. In addition, the Court made a clearly erroneous assessment of the evidence in this case by repeatedly concluding that the property was seized by prison authorities. [DE:712] Furthermore, the Court did not consider that the AUSA in this case justified the

26

seizure to prison officials by telling them that the Appellant was in possession of the hard drives in violation of a non-existing "protective order" issued by that same Court.

The District Court had clear discretion to exercise jurisdiction. This Circuit developed an exacting test for exercising equitable jurisdiction over suits flowing from the seizure of property where a gross constitutional violation would otherwise leave the subject of the search without any other recourse. *Richie v. Smith*, 515 F.2d at 1243-44 (5th Cir. 1975)[2] The test announced in *Richie* instructs the court to consider four factors: 1) "Whether the government displayed a 'callous disregard' for the plaintiff's Constitutional Rights; 2) Whether the plaintiff had an individual interest in and need for the material whose return he seeks; 3) Whether the plaintiff would be irreparably injured by the denial of the return of the property; and 4) Whether the plaintiff had an adequate remedy at law for redress of his grievance." See also *Trump v. United States*, 54 F.4th 689 (11th Cir. 2022)

The Court must first determine whether there was a "callous disregard" for the Appellant's Constitutional Rights. This violation should be the "foremost consideration" of the court in deciding whether it may exercise its equitable jurisdiction. *United States v. Chapman*, 559 F.2d. 402, 406 (5th Cir. 1977)

---

[2] In *Bonner v. City of Pritcherd*, 661 F.2d 1206, 1209 11th Cir 1981), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

27

In the case of *United States v. Bryant*, 685, F.App'x 855, 856 (11th Cir. 2017), this Court held that Rule 41(g) permits District Court to invoke its equitable jurisdiction to consider return of property claims, in "exceptional cases where equity demands intervention." (Id.)

This case at bar is the definition of "exceptional" as the circumstances of the seizure and proceedings are without precedent. The facts prove that the Government showed a "callous disregard" for the Appellant's Constitutional Rights. First, the AUSA justified the seizure to prison authorities by falsely claiming that Sabatino was in possession of the hard drives in violation of a non-existing protective order issued by the District Court. The Government was fully aware that no such order existed, and the Appellant was fully within his rights to possess the hard drives. In addition, the Government made no attempt to respect Sabatino's rights to attorney client privilege. *Harbor Healthcare Systems, L.P. v. United States*, 5 F.4th 593 (5th Cir. 2021). The Government was aware that the hard drives contain thousands of attorney client privileged communications and documents and that he was actively using the information on the hard drives to prepare for three open and pending criminal cases.

The Government has yet to submit even a shred of probable cause as to why they seized the hard drives. There has not been a single allegation that the hard drives likely contained evidence of any new crimes. It seems the only goal of this

28

seizure is for the Government to sift through the Appellant's attorney client privileged material.

Of course, the Appellant has an individual interest and need for the seized property. It was repeatedly submitted that these hard drives contain exculpatory evidence that he is in need of for his pending criminal cases.

Finally, the Appellant has no other remedy to challenge this illegal seizure. The Court was aware that by its own Order pursuant to 18 U.S.C. § 3582(e), the Appellant is under communication restrictions that prohibit him from communicating with and seeking redress with the District Court in Colorado.

Simply put, the extraordinary circumstances of this case demand that no other district court should have jurisdiction over this matter. The District Court in this Case is in the best position to rule on this Motion. The District Court did not consider any of the case specific facts, rather the denial claimed that the Court was barred from exercising jurisdiction due to the prior holdings in this Circuit. [DE:712] The District Court's denial of jurisdiction is based on a number of erroneous conclusions.

First, the hard drives were not seized by the BOP. This is simply not true. On January 17, 2025, an ADX officer thought that he might have seen the Appellant viewing an inappropriate image while reviewing the material on his hard drives. The officer was never exactly sure what he saw and was not aware that inmates hard drives often contain items such as cell phone extraction data and social media

29

forensic downloads. In an abundance of caution, the officer notified his superior who then notified ADX Florence Attorney Adam Powell. Mr. Powell reached out to AUSA Christopher Browne. At that point, AUSA Browne told Mr. Powell that the discovery was under a "protective order" issued by the Court and that the Appellant was prohibited from viewing the material on it. Mr. Powell was directed by AUSA Browne to restrict the Appellant's access to the hard drives, under the guise that the computer was broken, while he decided the course of action best to take in order to obtain possession of the hard drives.

The Appellant was unaware that any of this was going on. When he requested to view the material on his hard drives, rather than be told that the Government had ordered that the BOP deny him access, he was lied to and told the computer was broken. After the truth was uncovered, two ADX staff members admitted that they were ordered to lie to the Appellant. In *United States v. Mitchell*, 565 F.3rd 1347, 1350 (11th Cir. 2009) this Court found that the Government's retention of the defendant's hard drives for just 21 days without obtaining a warrant amounted to an unreasonable seizure. See also *United States v. Laist*, 702 F.3rd 608 (11th Cir. 2012)

The Government makes much ado about the alleged pornography on the hard drives, but the fact is that pornography was not the reason for the seizure. The Government's Response states "the BOP plainly has authority to seize and search what it suspects to be  contraband" [DE:710 at 4] and cites *United States v. Prevo*,

30

435 F.3rd 1343, 1346 (11th Cir. 2006). But again, in this case it is the AUSA and the FBI case agents in the SDFL who have seized and are attempting to "search" the hard drives, not the BOP.

The Government's Response contradicts itself in that this was a BOP seizure by arguing that the hard drives were seized as possible "fruits of his crimes". [DE:710 at 6] For the first time in the history of this case, in a footnote, the Government alleges that the Appellant "routinely" used his cell phones while incarcerated and "communicated with and solicited sexual explicit images and videos from women he met online or through his co-conspirators. At times, he paid and directed co-conspirators to pay the women with fraud proceeds". (Id. At Footnote 5) In the nine years of litigation in this case, this is the first time the Appellant has ever heard the Government make such an allegation. Never once in any document or proceeding did the Government allege such conduct. The Factual Proffer in this case, which is lengthy and sets forth every detail of the criminal conduct in this conspiracy, never mentioned or even suggest that the Appellant engaged in such activities. [DE:231] Frankly, the assertion the Government submits is absurd. To the extent it matters, the Appellant, vehemently denies it.

The Government's Response also several times falsely claims that the Appellant admitted that he was watching pornography. This is intentionally false. For instance, the Government writes "[Sabatino] claims he was watching the suspected pornography in preparation for an unscheduled, future hearing in [his open

31

criminal cases]".  [DE:710 at 7-8] Elsewhere, they write "[Sabatino] says the 'porn' he was watching his evidence from one of his cell phones in 2015". (Id.)

That is flat out incorrect. Even viewing it in a light most favorable to the Government, the Appellant never admitted to watching pornography at all. At best, there was a memo from ADX Officer Cromer dated January 26, 2025, which claims the Appellant stated "the porn on his discovery hard drive is evidence from one of his cell phones from 2015, and that he is allowed to possess that information and video". [DE:1] Never once did the Officer say that the Appellant admitted to *watching* pornography. It is important to note that as the District Court was advised, the Officer who purportedly wrote this memo now claims that he never heard this information and does not know why his memo says it. He agreed that the Appellant never said he had pornography on his hard drives, but rather, he was viewing Facebook download information.

The Government cites *Hudson v. Palmer*, 408 U.S. 517, 526 (1984) in which the Supreme Court held that a prisoner does not enjoy Fourth Amendment protections from unreasonable searches "within the confines of the prison cell." The Appellant does not contest this, the distinction between *Hudson v. Palmer* and this case is enormous. First, the Court held that a prisoner does not have Fourth Amendment protections from *prison authorities*. There is no indication that this applies to outside law enforcement agencies such as the FBI. In fact, in this very

32

case, the Government obtained warrants to search and seize property the defendant had in a cell previously.

Another distinction is that the hard drives were never, in fact, in the Appellant's cell. As explained earlier, in ADX Florence, the hard drives are kept in the Discovery Room, that only ADX staff have access to. This room is specifically for legal hard drives. The Appellant has not physically touched his hard drives since his arrival at ADX Florence 7 years ago. Thus, the hard drives are separated from the inmate population for the very purpose of prohibiting the content on them from entering the general  population of the prison. The unit in which the Appellant is housed contain some of the highest ranking terrorists, spies, and organized crime leaders in the United States. Each have hard drives that contain material that would be considered "contraband" if possessed by the inmate in population. This is why the property is segregated and separated from the inmates. Finally, the *Palmer* court did not contemplate the search and seizure of attorney client privileged materials.

In *United States v. Howell*, 425 F.3rd 971, 974 (11th Cir. 2005), this Circuit found that to prevail on a Rule 41(g) motion for return of property, a district court must "determine all the equitable considerations in order to make a fair and just decision". In The case at bar, the equitable considerations were not taken into account by the District Court. There was no other court in a better jurisdictional position to rule on this matter. The property was seized by a participant within the

33

jurisdictional limits of said Court, who used as a pretext to seize the hard drives an alleged "protective order" issued by the same District Court. Finally, the prosecution team in the SDFL took possession of the hard drives under the very same false pretense that there was an alleged protective order issued by the District Court of the SDFL that prohibited the Appellant from possessing and reviewing his hard drives. As a result, the Appellant's hard drives are now, and have been in the SDFL in the possession of the prosecution team.

Other circuits have held that a district court may exercise ancillary jurisdiction in a motion to return property where the property was seized in a different district. *United States v. Giovanelli*, 998 F.2d 116 (2nd Cir. 1993) The Eight Circuit has gone even further by holding that the district that presided over the criminal proceeding is the *only* proper district in which to bring Rule 41(e)[3] motion. *Thompson v. Covington*, 43 F.3d 974, 975 (8th Cir. 1995)

Some courts have ruled that the proper venue for motions to return property is the court where proceedings regarding the seizure took place. "Proper forum for hearings of either a motion to suppress or a motion for return of property is court of district in which evidence will be presented, not court of district in which seizure occurred". *United States v. Levasseur*, 609 F. Supp. 849 (D. Me. 1985).

"Post-conviction motion under Fed. R. Crim. P. 41 is a civil equitable proceeding and motion may be filed in either the district court where property was

---

[3] Rule 41(e) was later codified as Rule 41(g).

seized or district in which criminal proceeding took place." *U.S. Carter v. United States,* 62 Fed. CI. 365 ( Fed. CI. 09/29/2004)

The unique circumstances of this seizure dictates that the proper and only venue for the Motion to Return Property is the District Court in the SDFL. Specifically, in the Court overseen the case in which the lead AUSA not only directed the seizure, but did so by falsely stating to the BOP that the same Court issued an order prohibiting the Appellant from possessing them. As such, the District Court's Order of Denial should be vacated and remanded for further proceedings.

## II

### The District Court has jurisdiction over the violation of attorney client privilege by the Government in the case that is before the Court.

Attorney client privilege is one of the "oldest . . . privileges for confidential communications" and has been an important part of the American legal system for hundreds of years. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); see also *Hunt v. Blackburn,* 128 U.S. 464, 470 (1888) (discussing foundational importance of attorney client privilege); *In re Search Warrant Issued June 13, 2019*, 942 F. 3d 159, 167, 172–73 (4th Cir. 2019) (discussing attorney client privilege as "the oldest of the privileges" for confidential communications). In 1888, the United States Supreme Court explained that attorney client privilege is "founded upon the

35

necessity . . . of the aid of persons having knowledge of the law and skilled in its practice." As the Court said, effective legal assistance "can only be safely and readily availed of when free from the consequences or the apprehension of disclosure."*Blackburn*, 128 U.S. at 470. Id. A hundred years later, the Supreme Court expressed the view that attorney-client privilege promotes the "public interest in the observance of law and administration of justice" by ensuring that lawyers can communicate freely with their clients. *Upjohn Co.*, 449 U.S. at 389. These cases demonstrate that protecting attorney-client privilege has always been a fundamental value of the adversarial legal system. Attorney client privilege is no less important in jails and prisons than in other settings. In *Lanza v. New York*, the Supreme Court explained that "[e]ven in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection." *Lanza v. New York*, 370 U.S. 139, 143–44 (1962). The Ninth Circuit Court of Appeals elaborated on this when it said: [I]t takes no stretch of the imagination to see how an inmate would be reluctant to confide in his lawyer about the facts of the crime, perhaps other crimes, possible plea bargains, and the intimate details of his own life, and his family members' lives if he knows that a guard is going to be privy to them, too. *Nordstrom v. Ryan*, 762 F. 3d 903, 910 (9th Cir. 2014)

The attorney work product privilege differs from the attorney-client privilege. While the attorney client privilege only applies to communications between an

attorney and the client, the attorney work product privileges can include materials prepared by persons other than the attorney themselves, provided those materials were created to prepare for litigation.

The majority of the material in the hard drives is attorney client privileged. Most of the privileged communications and work product that are in the hard drives were developed during the pendency of the underlying Case before the District Court.

The hard drives contain a terabyte (TB) and a half of data. It is estimated that there are in upwards of a half-million pages of material on them, not including thousands of hours of audio and video recordings. In preparation for trial, in this case, the Appellant met almost daily with his legal team, at which time they reviewed the discovery. During these reviews, members of Appellant's legal team would make notes regarding Sabatino's recollection or explanation of certain documents on the hard drives. To locate and identify each document with the attorney's notes on them, would require the undersigned counsel to literally sit and review each page.

Also on the hard drives are numerous reports from the defense team, including but not limited to, weekly status reports of the defense investigators, summary of interviews of potential defense witnesses, and reports from defense experts.

The District Court in this case should have jurisdiction over attorney client privilege issues between the parties before it. "There was no reason to permit

37

opponents of the privilege to engage in groundless fishing expeditions, with the District Court as their unwitting (and  perhaps unwilling) agents." *Taylor Lohmeyer Law Firm P.L.L.C. v. United States*, 982 F.3rd 409, 411 (5th Cir. 2020) Despite the Government's contention that the Appellant somehow no longer enjoys or is entitled to attorney client privilege because the case at bar is closed [DE:710 at 9], the work product privilege does not end with the termination of the case in which it has been successfully asserted. *United States v. Leggett Platt, Inc.*, 542 F.2d 655 (6th Cir. 1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977); *In re Murphy*, 560 F.2d 326 (8th Cir. 1977); and *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973).

It is frankly troubling that the Government's Response actually stated that the Appellant "does not say why authorities cannot review" his attorney client privileged communications and work product. [DE:710 at 9] The Government incorrectly suggests the burden of explaining why they should not violate his attorney client priviledge is on the Appellant. It is equally troubling that the District Court did not address this egregious statement. For the most part neither the attorney client privilege nor the attorney work product doctrine have expiration dates contrary to what the Government suggests in its response. Well settled law presumes that the attorney client privilege survives the death of an individual client because knowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel. *Affiniti*

38

*Coloradi, LLC v. Kissinger & Fellman*, 2019 Colo. App. Lexis 1370 (2019) Similarly, the attorney work product doctrine, with a few exceptions not found in the case at a bar, will continue beyond the end of the case. The work product privilege does not end with the termination of the case in which it has been successfully asserted. *United States v. Leggett Platt, Inc.*, 542 F.2d 655 (6th Cir. 1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977); *In re Murphy*, 560 F.2d 326 (8th Cir. 1977); and *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973). The primary reason given for the survivability of the privilege is its purpose in protecting interrelated interests. *State of Florida v. Rabin*, 495 So. 2d 257, 262-263 (Fla. 3d D.C.A. 1986).

The Government's Response also states "to date, Sabatino has not provided authorities with a privilege log or even a single instance of potentially privileged communications to guide BOP and the FBI in their investigation and allow them to segregate that [privileged] material". [DE:710 at 8] To begin, the BOP is not and never has conducted an "investigation". Nor have they ever requested any information from the Appellant or his attorney. In fact, counsel for the Appellant repeatedly sent emails to ADX Attorney Powell about the attorney client privileged material, yet none of the emails were responded to. The bottom line is that the BOP/ADX had no part of this seizure other than acting at the direction of the AUSA in the SDFL.

39

Likewise, the FBI never contacted the Defendant or counsel to request any information concerning the attorney client privilege. The Government's claim is untrue.

On March 4, 2025, *after* the seizure was already directed, AUSA Browne sent counsel an email demanding he fill out a "privilege log" with "Bate stamp" numbers. Counsel responded, explaining that 1) he was not part of the trial team and could not provide specific bate stamp numbers, if they even exist; 2) after conferring with several of the other attorneys from the Appellant's trial team, he learned that there were thousands, if not tens of thousands of pages of privileged communications and documents throughout the hard drives. It was explained that the work product was created on the hard drives during daily legal conferences with Appellant and no mirror image of the material exists. Counsel would have to review the hard drives to identify every page of privileged material.

The Court should consider the sheer size and amount of material on these hard drives. It is estimated there is over 500,000 pages of material, which is the result of four different federal cases, seven State cases and years of attorney client work product. It would be a monumental task to provide a specific list of every privileged document. But also impossible task without access to the hard drives, as they are the only existing copies.

The District Court in this case should have jurisdiction over the Government's seizure of the attorney client privileged material in this case. It was

40

the opponent (the AUSA) in this case, not a Taint Team, who seized the material. Despite the Government's contention that the case is "closed" and the Appellant has no need for his discovery, the Appellant is still under Court Ordered Communication Restrictions and there is frequent litigation that still occurs, often instigated by the Government, and the Appellant has open and pending criminal cases that require his access to the information on the hard drives. Thus, the Court's Order of Denial should be vacated and remanded for further proceedings.

## III

### The District Court errored by Denying the Appellant an evidentiary hearing.

An evidentiary hearing is required for entry of a preliminary injunction where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should be issued. *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) In this matter, there is a multitude of disputed facts. First and foremost is to establish that the United States Attorneys Office of the SDFL, and specifically the AUSA in this Case, directed the seizure of the hard drives and as such no other Court should have jurisdiction. Second, to establish the credibility of Officer Cromer who wrote the memos that the Government relied on to illegally seize the hard drives. Third, to establish the seizure was not a BOP operation and that it was at the direction of the AUSA in this Case. Fourth, to establish that the Appellant was given no Due

41

Process regarding this seizure. Fifth, to establish that due to the Appellant's communication restrictions that the Appellant cannot obtain any relief in any other jurisdiction.

In an evidentiary hearing, the Appellant could have shown the officer who wrote the original memo admitted that he was ordered to do so, that he was further ordered to lie to the Appellant regarding the seizure, and that his second memo contains inaccurate, if not untruthful information, that he did not write.

Only through an evidentiary hearing would the Appellant be able to establish the truth of the dispute facts. Again, establishing the truthful version of the events, is imperative for the Court to correctly determine jurisdiction. Thus, the Court's Order should be vacated and remanded for an evidentiary hearing.

## IV

**The District Court violated the Appellant's Due Process Rights by holding that the proper venue is in the District of Colorado despite previously having imposed severe Communication Restrictions upon the Appellant pursuant to 18 U.S.C. 3582(e), which prohibit the Appellant from communicating with the District Court of Colorado.**

The Appellant is prohibited from communicating with anyone inside or outside of prison except for his attorney and a single family member. [DE:576]

42

This is a case of first impression in which a District Court restricted a Defendant's social communications to just one person as part of his sentence pursuant to 18 U.S.C. § 3582(e). Sabatino is prohibited from any form of cummunication with others, including his wife, brother, sister and other family members. Section 3582(e) restrictions have never been applied in this manner in this Circuit and in fact have only been used twice in the entire country: *United States v. Felipe*, 148 F.3d 101 (2nd Cir. 1998) and *United States v. Allmon*, 702 F.3d 1034 (8th Cir. 2013). To say this type of restriction is rarely used is an understatement and in any event, it has never been applied to the extent it has in this case.

The Appellant understood that due to the status and position of Sabatino within the organization it would be virtually impossible to identify every member or associate of his enterprise with whom his communications may pose a threat. He was also aware that the Government and Federal Law Enforcement identify many of Sabatino's immediate and extended family members as members and associates of the Gambino Organized Crime Family of LCN, and as such may be subject to restrictions. Based on Sabatino's history of ordering criminal activities from prison for a number of years, he understood the Government would seek communication restrictions.

The Appellant's restriction with filing public documents in the District of Colorado or any court for that matter, is the fear that he may encode messages with

43

instructions to members and associates of his organization to commit further criminal activity. As such, the District Court Ordered that all communications with the Court must be vetted and filed through counsel.

Although the Appellant strongly disagrees that the SDFL is not the proper venue, if the District Court felt that the Motion should have been filed in the District of Colorado, then considering the unique circumstances of this Case it had the obligation to transfer the motion to said district. "…In the interest of justice, a district court may transfer any civil action to any other district…where it might have been brought." 28 USC § 1404(a)  A motion for return of seized property filed pursuant to Rule 41(g) is considered to be a civil proceeding for equitable relief. *United Sates v. Potes Ramirez*, 260 F.3d 1310 (11th Cir. 2001) "Under the circumstances of this case… the court concludes that the motion for return of seized property should be transferred (from the District Ala.) to the U.S. District Court for the Eastern District of Louisiana for determination." *United States v. Scott,* 2003 U.S. Dist. LEXIS 28031 (M.D. Ala. 2003)

Being aware of these restrictions, as the District Court Ordered them, it errored when it found in its Order Denying Defendant's Emergency Motion for Return of Property that the "correct forum for the Motion is the District of Colorado, not the Southern District of Florida".  [DE:712 at 3] Without providing a method in which the Appellant could file an action in the District Court of Colorado, in essence the Appellant was denied Due Process of any kind.

44

The Appellant has no means to file any pleading with the District of Colorado, his attorney who has a special appointment to communicate with the Court on the Appellant's behalf, is not admitted to practice in the District of Colorado. Thus, the Order denying jurisdiction in effect denies the Appellant access to the District Court of Colorado. The Court's Order should be vacated and remanded back to determine how the Appellant can have access to the District Court of Colorado.

<u>CONCLUSION</u>

Based upon the foregoing argument and citations of authority, the Court should vacate the Denial by the District Court of the Appellant's Motion for Return of Property and an Evidentiary Hearing and remanded back to the District Court for further proceedings. Respectfully submitted,

By: *Israel Jose Encinosa*
        Israel J. Encinosa, Esq.

45

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 10, 2025, the foregoing brief was electronically uploaded to the Eleventh Circuit Court of Appeals' Internet web site at www.ca11.uscourts.gov. I hereby further certify that on the same date a true and correct copy of the foregoing Brief was mailed by U.S. mail to Assistant United States Attorney, Daniel Matzkin, 99 N.E. 4 Street, Miami, Florida 33132.


By: *Israel Jose Encinosa*
Israel Jose Encinosa, Esq.
FBN 435007

46